**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

**AILEEN GONZALEZ-GARCIA,**

    **Plaintiff,**

    **v.**                                                                    **Civil No. 11-2019 (GAG)**

**DORADO HEALTH, INC., D/B/A MANATI**

**MEDICAL CENTER,**

    **Defendant.**

## OPINION AND ORDER

    Aileen Gonzalez-Garcia ("Plaintiff") filed the instant action against Dorado Health Inc., d/b/a Manati Medical Center ("Defendant" or "the Hospital") on October 14, 2011, alleging race and color discrimination. (Docket No. 1) Plaintiff claims Defendant violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*.; Puerto Rico Law No. 100 of June 30, 1959 ("Law 100"), P.R. LAWS ANN. tit. 29, §§ 146 *et seq*.; and Article 1802 of the Puerto Rico Civil Code ("Article 1802"), P.R. LAWS ANN. tit. 31 § 5141.

    Presently before the court is Defendant's motion for summary judgment (Docket No. 27). Plaintiff filed an opposition to this motion at Docket No. 37, and Defendant filed a reply brief at Docket No. 44. After considering the pleadings and the pertinent law, the court **GRANTS** Defendant's motion for summary judgment (Docket No. 27).

**I.**    **Standard of Review**

    Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see FED. R. CIV. P. 56(a). "An issue

**Civil No. 11-2019 (GAG)**                    2

is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted). The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. "The movant must aver an absence of evidence to support the nonmoving party's case. The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of any and all reasonable inferences. Id. at 255. Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

## II.    Factual Background

On April 19, 2007, Plaintiff applied for a position of cook in the Hospital's Diet Department. (See Docket Nos. 25 at ¶ 1; 38 at ¶ 1.) After interviewing five candidates for the position, Evangelina Ruiz ("Ruiz"), Director of the Diet Department, and Jasmine Rivera ("Rivera"), Supervisor of Production of the Diet Department, hired Plaintiff as a full time cook. (See Docket Nos. 25 at ¶ 2; 38 at ¶ 2.) Rivera spent most of her time in the kitchen supervising the cooks, while

**Civil No. 11-2019 (GAG)**                              3

Ruiz spent most of her time in an office adjacent to the kitchen.  (See Docket Nos. 25 at ¶ 4; 38 at ¶ 4.)  As Plaintiff's immediate supervisor, Rivera evaluated Plaintiff's performance once a month during the ninety day probationary period beginning on April 24, 2007, and thereafter annually with written evaluations dated April 30, 2008 and May 8, 2009.  (See Docket Nos. 25 at ¶¶ 11-15; 38 at ¶¶ 11-15.)  In all five evaluations, Rivera awarded Plaintiff an overall performance rating of "Excellent."  (See id.)  In the last evaluation, Rivera gave Plaintiff a low score in the attendance section.  (See Docket Nos. 25 at ¶ 17; 38 at ¶ 17.)  This low score did not affect Plaintiff's overall score of "Excellent."  (See id.)

    Plaintiff claims that after she had been employed for one year, Rivera began making comments regarding Plaintiff's race and color.  (See Docket No. 38-1 at ¶ 7.)  Plaintiff claims Rivera made the following comments:

    1. In June 2008, when Plaintiff was discussing her vacation plans with coworkers, Rivera told her, "Girl, what are you talking about, you do not have where to fall dead [sic], you do not have a car, you do not even know how to rent a car."  (See id. at ¶ 9.)

    2. On August 9, 2008, Rivera looked at the plantains Plaintiff was frying and said "Look, that's even blacker than you.  Throw it away that it's no good."  During the same shift Rivera saw Plaintiff burn some french fries and said, "the fries are like you, black, they cannot be served.  Throw them out and fry new ones."  (See id. at ¶ 10.)

    3. On August 19, 2008, Rivera told two employees from housekeeping: "Look, don't you have a gallon of Clorox to pour it over her to see if she whitens a bit."  (See id. at ¶ 11.)

    4. On August 22, 2008, sauce splashed on Plaintiff's arm.  Rivera told Plaintiff not to worry because the sauce was the same color as her skin, though if the sauce would have fallen on Rivera it would be seen from the sky.  (See id. at ¶ 12.)

    5. On November 28, 2008, "Rivera admonished a new cook that the potatoes were black, just like Plaintiff."  (See id. at ¶ 13.)

    6. Shortly before Christmas 2008, Rivera told Plaintiff that Rivera's daughter did not like

**Civil No. 11-2019 (GAG)**                    4

to play with black dolls.  (<u>See</u> <u>id.</u> at ¶ 14.)

7. On January 2009, Rivera told Plaintiff that if soy sauce fell on Plaintiff it would not be noticeable.  (<u>See</u> <u>id.</u> at ¶ 15.)

8. On April 13, 2009, Rivera told a new supplier of bakery products, "Look, those doughnuts have to be returned because they are like my cook, look, black.  That's no good.  We can't sell it like that."  (<u>See</u> <u>id.</u> at ¶ 16.)

On March 31, 2009, Ruiz gave Plaintiff a written warning regarding Plaintiff's absences and tardiness.  (<u>See</u> Docket No. 33-18.)  The writing  states that Plaintiff had been absent twenty times and tardy four times within fifteen months.  (<u>See</u> <u>id.</u>)  Plaintiff claims that her employee file reflects that all her absences were approved by the Hospital.  (<u>See</u> Docket No. 38-1 at ¶ 19.)  However, Plaintiff did not proffer the employee file as evidence.

On August, 22, 2009, Alberto Mendez ("Mendez") supervised the kitchen while Rivera was off duty.  According to Mendez, people in the cafeteria complained to him that Plaintiff told them the food being served was spoiled.  (<u>See</u> Docket No. 33-20.)  Jose Santos ("Santos"), who works in the Hospital's cafeteria, claims that Plaintiff told him the food was rotten.  (<u>See</u> Docket No. 33-22.)  Mendez and Hector Feliciano ("Feliciano"), who cooked the allegedly spoiled food, investigated the allegations and determined that the food was in perfect condition.  (<u>See</u> Docket No. 33-21 at 5, L. 2-9.)  Mendez and Santos each wrote a complaint to Ruiz.  (<u>See</u> Docket Nos. 33-20; 33-22.)  In her deposition, Plaintiff admits she said the food was ruined.  (<u>See</u> Docket No. 33-1 at 80, L. 12-14.)  She further states in her sworn affidavit that she was reprimanded for refusing to recycle the leftover food from a previous day.  (<u>See</u> Docket No. 38-1 at ¶ 19.)

On August 23, 2009, when Mendez was supervising the kitchen, Plaintiff cooked food that was not on the menu.  Mendez also addressed this issue in his letter to Ruiz dated August 25, 2009.  (<u>See</u> Docket No. 33-20.)  Plaintiff claims she was instructed by Mendez and Marisol Martinez ("Martinez"), the dietetics supervisor, to cook food that was not on the menu.  (<u>See</u> Docket No. 38-1 at ¶ 19.)  Mendez denies he instructed Plaintiff to cook food that was not on the menu.  His written

**Civil No. 11-2019 (GAG)**                    5

complaint to Ruiz, however, seems to suggest that Martinez was aware Plaintiff cooked the food.[1]

On August 25, 2009, Feliciano complained that Plaintiff referred to him as a "drug addict pig." (See Docket No. 33-24.) Feliciano made a written statement to Ruiz denying he was a drug addict pig and that he was concerned it could affect his reputation. (See id.) Plaintiff admits she said the words "drug addict pig" in the kitchen, but that the comment was not directed at anyone in particular. (See Docket No. 38-1 at ¶ 19.) Plaintiff claims that when she did not find some sofrito she prepared in the kitchen, she asked, "who was the drug addict pig who took my sofrito?" (See Docket No. 37 at ¶ 14.)

While working at the Hospital, Plaintiff's shift ended at 3:30 p.m. and she took classes to become a certified chef beginning at 5:00 p.m. (See Docket Nos. 25 at ¶ 46; 38 at ¶ 46.) Plaintiff wanted a shift change in order to go home to see her daughter and change before her class. (See id.) Rivera told her she would try to make an adjustment, but that scheduling depended on the Hospital's needs. (See id.) Plaintiff never considered going to class straight from work and she never formally requested an accommodation to study. (See id.) Plaintiff claims the Hospital made arrangements to help Soto, another cook, take classes in Carolina. (See Docket Nos. 25 at ¶ 48; 38 at ¶ 48.) However, Plaintiff does not know what efforts Soto made to obtain arrangements to study. (See id.) An agreement dated June 3, 2010 shows that Soto consented to receive financial assistance in exchange for an agreement to work for the Hospital for three years. (See Docket Nos. 25 at ¶ 49; 38 at ¶ 49.)

On one occasion, Plaintiff worked seven consecutive days, had one day off, and then worked for six consecutive days. (See Docket Nos. 25 at ¶ 50; 38 at ¶ 50.) Plaintiff, though, was compensated with overtime pay and was unsure whether or not other employees had to work seven

---

[1] In Mendez' complaint to Ruiz, he wrote that he asked Martinez why Plaintiff cooked food that was not on the menu. Martinez replied she instructed Plaintiff to give some of the food to Mendez. (See Docket No. 33-20.)

**Civil No. 11-2019 (GAG)**                    6

consecutive days.  (See id.)  When Plaintiff was hired, she signed a document agreeing to work extra

hours if required by the Hospital.  (See id.).

On August 27, 2009, Plaintiff was suspended by Ruiz for ten days without pay.  (See Docket

Nos. 25 at ¶ 28; 38 at ¶ 28.)  Ruiz testified she suspended Plaintiff for several reasons including

absences and tardiness, because Plaintiff used inappropriate language towards another co-worker,

and because she spoke disrespectfully about the Hospital.  (See Docket No. 33-3 at 15, L. 9-18.)

Ruiz based her decision on the complaints of numerous supervisors, including Rivera and Mendez.

(See id. at 15, L. 19-25; 16, L. 1.)  Rivera did not participate in an investigation nor did she

recommend a course of action.  (See id. at 19, L. 5-16.)  Her participation was limited to informing

Ruiz of certain incidents with Plaintiff and being present during the suspension.  (See id. at 17, L.

20-25; 18, L. 5-12; 20, L. 4-6.)  On September 10, 2009, while on suspension, Plaintiff resigned

from her position as cook.  (See Docket 25 at ¶ 36; 38 at ¶ 36.)

**III.    Discussion**

Plaintiff claims she suffered a pattern of discrimination and disparate treatment by

Defendants.  Specifically, Plaintiff offers evidence of eight allegedly discriminatory comments and

a ten day suspension to support her claims.  Consequently, we discuss Plaintiff's claims and find that

she does not prevail.

**A.    Discrimination Under Title VII**

Title VII prohibits employers from discriminating "against any individual with respect to

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff can establish a

discrimination claim through direct evidence or through the cumulative effect of indirect evidence

of the employer's motivation.  See Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 909 (1st Cir.

1988); Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).

Direct evidence "consists of statements by a decisionmaker that directly reflect the alleged

**Civil No. 11-2019 (GAG)**                    7

animus and bear squarely on the contested employment decision." <u>Febres v. Challenger Caribbean Corp.</u>, 214 F.3d 57, 60 (1st Cir. 2000).  Furthermore, "[d]irect evidence does not include stray remarks in the workplace, particularly those made by nondecisionmakers or statements made by decisionmakers unrelated to the decisional process itself." <u>Ayala-Gerena v. Bristol Myers-Squibb Co.</u>, 95 F.3d 86, 96 (1st Cir. 1996) (stating remarks or comments must be linked to adverse employment decision); <u>see also</u> <u>Duchesne v. Banco Popular de Puerto Rico, Inc.</u>, 742 F. Supp. 2d 201 (D.P.R. 2010) (holding Plaintiff did not show that supervisor considered Plaintiff's gender in termination).

Where there is evidence of both discriminatory and non-discriminatory animus the court may evaluate the evidence using the mixed motive framework set forth in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989).[2]  <u>See</u> <u>Hillstrom v. Best Western TLC Hotel</u>, 354 F.3d 27, 31 (1st Cir. 2003).  Under this framework, codified at 42 U.S.C. § 2000e-2(m), a "plaintiff's burden is tempered so that [he or] she need prove only that the discriminatory action was a motivating factor in an adverse employment decision." <u>Patten v. Wal-Mart Stores East, Inc.</u>, 300 F.3d 21, 25 (1st Cir. 2002). "[T]he employer has a limited affirmative defense that does not absolve it of liability, but restricts the remedies available to a plaintiff." <u>Desert Palace</u>, 539 U.S. at 94.  To avail itself of the affirmative defense, the employer must "demonstrat[e] that [it] would have taken the same action in the absence of the impermissible motivating factor."  42 U.S.C. § 2000e-5(g)(2)(B).

Where there is no direct evidence of discrimination, courts apply the McDonnell Douglas burden shifting framework. <u>Straughn v. Delta Air Lines, Inc.</u>, 250 F.3d 23, 34 (1st Cir. 2001) (citing <u>Conward v. Cambridge Sch. Comm.</u>, 171 F.3d 12, 19 (1st Cir. 1999)).  Under McDonnell Douglas, a plaintiff has the initial burden of establishing a *prima facie* case  of Title VII discrimination. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). To prove a *prima facie* case of racial

---

[2]In <u>Desert Palace</u>, the Supreme Court held that direct evidence of discrimination is not required for a mixed-motive analysis. 539 U.S. at 101.

**Civil No. 11-2019 (GAG)**                      8

discrimination, a plaintiff must show that (1) she belonged to a protected class; (2) that her job performance was satisfactory and met the employer's legitimate expectations; (3) that she suffered an adverse employment action; and (4) that the employer sought a replacement with roughly equivalent job qualifications. Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173-74 (1st Cir. 2003) (citing Smith v. Stratus Computer, Inc., 40 F.3d 11, 15 (1st Cir. 1994)). Once the plaintiff establishes a *prima facie* case, the employer has the burden of production to articulate a legitimate and non-discriminatory reason for the adverse employment action. Benoit, 331 F.3d at 174. If the employer meets this burden, the burden shifts back to the plaintiff to show "that the reason was a coverup for a discriminatory decision." Id. (citing Straughn, 250 F.3d at 34). In other words, the plaintiff must adduce sufficient evidence to demonstrate that race and color were a motivating factor in the employment action.

Under the mixed motive and McDonnell Douglas frameworks, "plaintiffs must present enough evidence to permit a finding that there was a differential treatment in an employment action and that the adverse employment decision was caused at least in part by a forbidden type of bias." Chadwick v. WellPoint, Inc., 561 F.3d 38 (1st Cir. 2009) (quoting Hillstrom, 354 F.3d at 31) (discussing the "interaction between Desert Palace and McDonnell Douglas"); see also Casella v. MBNA Mktg. Sys., No. 8-176-B-W, 2009 WL 1621411, at *22 (D. Me. June 9, 2009).

**1.     Direct Evidence Analysis**

The court holds that Plaintiff fails to establish via direct evidence of race and color discrimination a genuine issue of material fact. Plaintiff attempts to proffer direct evidence of discrimination by describing eight allegedly disparaging comments made by Rivera. However, Ruiz, and not Rivera, made the disciplinary decision to suspend Plaintiff for ten days. There is no evidence that Ruiz made any discriminatory comments and there is no evidence that Rivera's remarks are related to, caused, or contributed to Ruiz' decision to suspend Plaintiff. Because the comments were not made by the decisionmaker and because there is no causal relationship between Rivera's remarks and the subsequent decisionmaking by Ruiz, this court finds that Plaintiff fails to

**Civil No. 11-2019 (GAG)**                    9

establish direct evidence of discrimination.

### 2.    Indirect Evidence Analysis

In the alternative to direct evidence of discrimination, Plaintiff asks the court to find Rivera's comments fall within the mixed motive category. Plaintiff, however, did not utilize the mixed motive analysis in her brief. Instead, Plaintiff merely states that she has produced "ample existence of direct evidence that a proscribed factor (such as age, gender, race, or national origin) played a motivating part in the disputed employment decision."[3] Even if Plaintiff had referred to specific evidence, she would not be able to prove that race was a motivating factor in the suspension. Furthermore, Plaintiff did not make any mention of the McDonnell Douglas burden shifting framework. Given that this is a Title VII employment discrimination suit, the court will briefly address Plaintiff's merits under the burden-shifting framework. Unfortunately for Plaintiff, she does not prevail under this approach either.

Plaintiff did not present any evidence supporting a McDonnell Douglas claim and therefore there are no genuine issues of material fact. Plaintiff fails to make a *prima facie* case and, assuming *arguendo* that she meets this burden, she has not rebutted the Hospital's proffered legitimate reason for suspending her. The Hospital produced evidence that Plaintiff had excessive absences and tardiness, prepared special meals for herself and the supervisors, made an offensive comment in the kitchen, and told employees of the Diet Department that the food being served was spoiled. Most of these complaints were made by employees other than Rivera. Plaintiff, then, has not satisfied her burden of demonstrating that the Hospital's stated reasons were a pretext for prohibited

---

[3] Plaintiff does not cite to any evidence in support of her mixed motive analysis. The court will give Plaintiff the benefit of the doubt and address her conclusory assertions as having raised a mixed motive claim. However, since the Plaintiff does not apply the facts of her case to the governing law, the court will not act as Plaintiff's advocate and will only consider her arguments made throughout other parts of her brief. See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (stating Court will not pay heed to "conclusory allegations, improbable inferences (or) unsupported speculation.")); see also Lakshman v. Univ. of Maine Sys., 328 F. Supp. 2d 92, 108 n.22-24 (D. Me. 2004).

**Civil No. 11-2019 (GAG)**          10

discrimination.  Plaintiff states her decision to resign was based solely on Rivera's discriminatory actions.  She fails to present evidence that Rivera influenced Ruiz' decision to suspend her.  There is, then, no evidence that Ruiz' decision to suspend Plaintiff was based on racial animus.  Ruiz merely admits to have known of one comment made by Rivera, but Ruiz considered it a joke.  In conclusion, there is no evidence that Rivera's complaint to Ruiz was tainted by discriminatory animus nor that Ruiz solely relied on Rivera's information.

Since Plaintiff has failed to present evidence to permit a finding that the suspension was caused, at least in part, by a forbidden type of bias in the McDonnell Douglas analysis, she will not prevail under her mixed motive claim.

Therefore, this court finds that Plaintiff does not prevail under a mixed motive analysis nor the McDonnell Douglas framework.

**B.     Disparate Treatment Under Title VII**

"In disparate-treatment cases, plaintiffs bear the ultimate burden of proving that they were the victims of intentional discrimination."  Udo v. Tomes, 54 F.3d 9, 12 (1st Cir. 1995) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993)).  Where there is no direct evidence of discrimination, courts use the McDonnell Douglas framework.  Id.  In disparate treatment cases, courts consider comparative evidence at the third step of the McDonnell Douglas framework.  Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003) (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 19 (1st Cir. 1999)).  The plaintiff must show "that others similarly situated to him in all relevant respects were treated differently by the employer."  Conward, 171 F.3d at 20; see also Kosereis, 331 F.3d at 214.

In this instance, Plaintiff does not produce any evidence that she was treated differently than other similarly situated employees.  Plaintiff merely argues that Rivera's alleged discriminatory comments and the ten-day suspension are sufficient to prove disparate treatment.  Plaintiff makes no effort to analyze her disparate treatment claim.  By tethering her disparate treatment claim to her

**Civil No. 11-2019 (GAG)**                    11

discrimination claim with the same evidence, the failure of one is the failure of the other.  Because

the court has found Plaintiff failed to prove her discrimination claim, she also fails in her disparate

treatment claim.

### C.    Local Law Claims

Plaintiff's complaint also alleges claims that arise under Law 100 and Article 1802.  It is

within the discretion of the court to exercise supplemental jurisdiction over local law claims once

the federal claims have been dismissed.  See Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177

(1st Cir. 1995) (stating, "To be sure, the exercise of supplemental jurisdiction in such circumstances

is wholly discretionary.")  In this case,  all of Plaintiff's local law claims arise from the same set of

alleged discriminatory acts as Plaintiff's federal law claims.  The court has analyzed the pertinent

facts and found no genuine issues of material fact exist.  In order to conserve judicial resources, the

court exercises its discretion to rule on Plaintiff's local law claims.  These claims fail for the same

reasons as Plaintiff's federal law claims fail, that is, she has not created any genuine issue of material

fact as to racial discrimination.  More so, she is not claiming discrimination for unlawful termination

under any other basis.  Therefore, the court **DISMISSES** Plaintiff's local law claims.

### IV.    Conclusion

For the foregoing reasons, the court **GRANTS** Defendant's motion for summary judgment

at Docket No. 27.


**SO ORDERED**

In San Juan, Puerto Rico this 30th day of January, 2013.




*S/Gustavo A. Gelpí*

GUSTAVO A. GELPÍ

**Civil No. 11-2019 (GAG)**                    12

United States District Judge